# No. 24-40704

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

**GREG MURPHY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**

**Plaintiff - Appellant**

**v.**

**BEAUMONT INDEPENDENT SCHOOL DISTRICT; SHANNON ALLEN,**

**Defendants - Appellees**

---

## On Appeal from
United States District Court for the Eastern District of Texas

1:22-CV-135

---

# REPLY BRIEF OF APPELLANT GREG MURPHY

SUBMITTED BY:

Brandon P. Monk
Monk Law Firm
4875 Parker Drive
Beaumont, TX 77705

# **TABLE OF CONTENTS**

*TABLE OF CONTENTS* ................................................................................... *i*

*TABLE OF AUTHORITIES* .............................................................................*1*

*ARGUMENT* ..................................................................................................*3*

**I. THE DISTRICT COURT ABUSED ITS DISCRETION BY EXCLUDING OFFICER NORMAN'S DECLARATION**.............................**3**

   A. Applicable Legal Principles Related to Exclusion of Officer Norman's Declaration ....................................................................................................4

   B. Officer Norman's Declaration Provided Specific Facts Based on Personal Knowledge .................................................................................................5

   C. The Fifth Circuit Prohibits Striking Evidence as Merely "Self-Serving"......5

   D. The District Court Applied an Erroneous Legal Standard.............................6

   E. The Exclusion Prejudiced Murphy's Constitutional Claims .........................6

   F. The District Court Failed to Apply the Summary Judgment Standard ..........7

**II. MURPHY POSSESSED A PROTECTED PROPERTY INTEREST IN PREMIUM PAY UNDER BOARD POLICY DEA (LOCAL)**........................**7**

   A. Legal Standard for Protected Property Interests .............................................8

i

B. Board Policy DEA (Local) Created a Mandatory Entitlement Using "Shall" Language .................................................................................................8

C. Murphy Satisfied All Prerequisites Under Board Policy DEA (Local) .........9

D. Appellees' "Modified Operations" Distinction Constitutes Impermissible Post Hoc Rationalization .........................................................................10

E. Murphy Was Denied Adequate Procedural Due Process ...........................12

F. BISD's Actions Violated Substantive Due Process .....................................13

G. Appellees' Arguments Lack Merit ...............................................................14

III. MURPHY ESTABLISHED MUNICIPAL LIABILITY UNDER MONELL ...............................................................................................15

A. Legal Standard for Municipal Liability Under Section 1983 ......................15

B. Dr. Allen Possessed Final Policymaking Authority Through Express Delegation ...............................................................................................16

C. Murphy Presented Sufficient Evidence of an Unofficial Custom of Retaliation ...............................................................................................19

D. The District Court Improperly Dismissed Causal Connection ...................20

E. Appellees' Arguments Fail to Negate Municipal Liability ..........................22

F. Section 1983 Demands Specific Policy Identification .................................23

**IV. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON MURPHY'S FIRST AMENDMENT RETALIATION CLAIM**............................................................................**23**

    A. Legal Framework for First Amendment Retaliation Claims ......................23

    B. Murphy's Speech Constituted Protected Expression on Matters of Public Concern .......................................................................................................23

    C. Genuine Issues of Material Fact Preclude Summary Judgment on Causation ....................................................................................................25

    D. Appellees' Arguments Fail to Negate First Amendment Protection............27

**V. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON MURPHY'S FOURTH AMENDMENT MALICIOUS PROSECUTION CLAIM** .........................................................................**27**

    A. Legal Framework for Fourth Amendment Malicious Prosecution Claims .27

    B. Appellees Mischaracterize the Procedural Posture ......................................28

    C. Genuine Issues of Material Fact Preclude Summary Judgment on Probable Cause .........................................................................................................29

    D. Evidence of Malice and Retaliatory Intent ..................................................30

**VI. ISSUE FIVE: DR. ALLEN IS NOT ENTITLED TO QUALIFIED IMMUNITY** ...........................................................................................**32**

    A. Standard of Review for Qualified Immunity ................................................32

B. Murphy Established Violations of Clearly Established Constitutional Rights

.................................................................................................................33

C. Dr. Allen's Conduct Was Objectively Unreasonable ....................................36

D. Factual Disputes Preclude Qualified Immunity at Summary Judgment......38

*CONCLUSION*...........................................................................................................*39*

*CERTIFICATE OF SERVICE* ..............................................................................*41*

*CERTIFICATE OF COMPLIANCE*......................................................................*42*

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Ashley*, 60 F.4th 262, 280 (5th Cir. 2023)...........................................32

*Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) ...........................................8, 40

*Certain Underwriters at Lloyds, London v. Axon Pressure Prod., Inc.*, 951 F.3d 248,

    256 (5th Cir. 2020) .............................................................................................3

*Chiaverini v. City of Napoleon,* 602 U.S. 556, 556 (2024) .....................................34

*City of Canton v. Harris*, 489 U.S. 378, 389 (1989)................................................23

*Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997)..........3

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)............................ 13, 40

*Connick v. Myers*, 461 U.S. 138, 147-48 (1983) .....................................................27

*Connick v. Thompson*, 563 U.S. 51, 61 (2011).........................................................21

*County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)......................................14

*Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) .........................................17

*Favela v. Collier*, 91 F.4th 1210, 1213 (5th Cir. 2024)..............................................3

*Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 236 (5th Cir. 2003) .............................4

*Garcetti v. Ceballos*, 547 U.S. 410, 420-21 (2006)................................................28

*Garza-Flores v. Mayorkas*, 38 F.4th 440, 445 (5th Cir. 2022) ............................3, 6

*Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160-61 (5th Cir. 2021)................5

*Hare v. City of Corinth, Miss.*, 135 F.3d 320, 325 (5th Cir. 1998) ........................38

*Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999) .................27

*Heinsohn v. Carabin & Shaw*, 832 F.3d 224 (5th Cir. 2016) ...................................5

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ...............................................................44

*Illinois v. Gates*, 462 U.S. 213 (1983) ....................................................................41

*Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992) ................................................18

*Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) ............................................38

*Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 463 (1989)........8

*Lane v. Franks*, 573 U.S. 228, 240 (2014)...................................................... 28, 41

*Longoria ex rel. M.L. v. San Benito Independent Consolidated School District*, 942

    F.3d 258, 271 (5th Cir. 2019) ...........................................................................18

*McMillian v. Monroe County*, 520 U.S. 781, 786 (1997).......................................18

*Monell v. Department of Social Services*, 436 U.S. 658 (1978).........................6, 17

*Montgomery Independent School District v. Davis*, 34 S.W.3d 559, 565 (Tex. 2000)

    ...................................................................................................................16

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) ........30

*Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ...............................................................38

*Pembaur v. Cincinnati*, 475 U.S. 469, 483-484 (1986).................................... 19, 23

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).......................................................41

*Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).........................25

*Ratliff v. Aransas County*, 948 F.3d 281, 286 (5th Cir. 2020)..................................3

*Rockwell v. Brown*, 664 F.3d 985, 990 (5th Cir. 2011) .............................................38

*Thompson v. Clark*, 596 U.S. 36 (2022) ......................................................... 32, 41

*Tolan v. Cotton*, 572 U.S. 650, 656 (2014)...............................................................44

*Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019)........................18

*White v. Pauly*, 580 U.S. 73, 79 (2017) ....................................................................38

*Wigginton v. Jones*, 964 F.3d 329, 336 (5th Cir. 2020)..............................................9

**Statutes**

42 U.S.C. § 1983 ........................................................................................................17

**Rules**

FRE 701 .........................................................................................................................4

## ARGUMENT

## I. THE DISTRICT COURT ABUSED ITS DISCRETION BY EXCLUDING OFFICER NORMAN'S DECLARATION

The district court committed reversible error by sustaining Defendants' objections to paragraphs 5 and 6 of Officer Shanter Norman's declaration. ROA.1174. This evidentiary ruling excluded crucial firsthand testimony that would have created genuine issues of material fact on Murphy's First Amendment

retaliation and Fourth Amendment malicious prosecution claims, thereby requiring reversal of the summary judgment order.

A.    **APPLICABLE LEGAL PRINCIPLES RELATED TO EXCLUSION OF OFFICER NORMAN'S DECLARATION**

Under Federal Rule of Civil Procedure 56(c)(4), an affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. However, the contents of summary judgment declarations cannot be conclusory or based upon mere information and belief; rather, the facts must be specific and otherwise admissible as evidence at trial. *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997). But courts have repeatedly held that the personal knowledge requirement of Rule 56 can be "reasonably inferred" from the circumstances—such as the affiant's identity and relationship to the relevant subject matter. *Garza-Flores v. Mayorkas*, 38 F.4th 440, 445 (5th Cir. 2022).

Critically, an assertion in a declaration is conclusory only if it "relies on inferences without also setting forth the facts that support those inferences." *Favela v. Collier*, 91 F.4th 1210, 1213 (5th Cir. 2024). Moreover, courts must resist the urge to resolve disputes at summary judgment and may not make credibility determinations or weigh evidence. *Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 236 (5th Cir. 2003).

**B.    OFFICER NORMAN'S DECLARATION PROVIDED SPECIFIC FACTS BASED ON PERSONAL KNOWLEDGE**

Norman's declaration contained concrete factual statements grounded in his personal observations: Murphy was "calm and non-threatening" during the arrest, and "no one made any specific statements" to Norman about an actual threat Murphy had made. ROA.1073-1075. These observations derive directly from Norman's role as the responding officer and constitute admissible testimony under Federal Rule of Evidence 701, which permits lay witnesses to testify based on personal knowledge. FRE 701.

Additionally, Norman's statement that BISD's conduct represented "a pattern and practice of retaliatory treatment of employees by the district that speak on matters of public concern" was explicitly based on his "years of experience with BISD." ROA.1073-1074.

**C.    THE FIFTH CIRCUIT PROHIBITS STRIKING EVIDENCE AS MERELY "SELF-SERVING"**

In *Heinsohn v. Carabin & Shaw*, 832 F.3d 224 (5th Cir. 2016), this Court reversed a district court's exclusion of employee testimony, holding that evidence cannot be struck merely for being "self-serving." The Court warned that accepting employer evidence while rejecting employee testimony "would signal that an employee's account could never prevail over an employer's."

5

As this Court recently reaffirmed in *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160-61 (5th Cir. 2021), "self-serving" affidavits may create fact issues even when not supported by other evidence. Where self-interested affidavits constitute otherwise competent evidence, "they may not be discounted just because they happen to be self-interested." *Id.* How much weight to credit such evidence presents a credibility question that judges may not evaluate at summary judgment.

## D.    THE DISTRICT COURT APPLIED AN ERRONEOUS LEGAL STANDARD

The district court's ruling that Norman's declaration was "conclusory, speculative, and lacks foundation" reflects an erroneously restrictive view of admissible summary judgment evidence. ROA.1172-ROA.1174. Norman's factual observations about Murphy's demeanor and the absence of specific threat statements were based on his direct participation in the arrest. His assessment of BISD's retaliatory pattern was grounded in years of employment with the District.

## E.    THE EXCLUSION PREJUDICED MURPHY'S CONSTITUTIONAL CLAIMS

Norman's testimony that Murphy appeared calm and non-threatening, with no witnesses providing specific details of threats, creates a genuine dispute about whether Murphy actually engaged in unprotected conduct or was falsely accused. This factual dispute is central to both Murphy's retaliation claim (whether his speech

6

was protected) and his malicious prosecution claim (whether probable cause existed for his arrest).

Furthermore, Norman's testimony about BISD's "pattern and practice of retaliatory treatment" provided direct evidence of the municipal custom necessary for liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The district court's exclusion of this evidence deprived Murphy of probative testimony supporting his claims against the District itself.

### F.    THE DISTRICT COURT FAILED TO APPLY THE SUMMARY JUDGMENT STANDARD

The competing accounts of Murphy's conduct—his own testimony that he discussed civil rights history versus the single witness claiming he made threats—exemplify precisely the type of factual dispute that summary judgment cannot resolve.

## II.    MURPHY POSSESSED A PROTECTED PROPERTY INTEREST IN PREMIUM PAY UNDER BOARD POLICY DEA (LOCAL)

When properly analyzed under established due process precedent, Murphy clearly possessed a legitimate claim of entitlement to premium pay, and BISD's deprivation of that interest violated both procedural and substantive due process.

A. **LEGAL STANDARD FOR PROTECTED PROPERTY INTERESTS**

Property interests protected by the Due Process Clause "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). To establish a protected property interest, a plaintiff must demonstrate a "legitimate claim of entitlement" to the benefit at issue. *Id.*

The Supreme Court has emphasized that courts must look for "'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest." *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 463 (1989).

B. **BOARD POLICY DEA (LOCAL) CREATED A MANDATORY ENTITLEMENT USING "SHALL" LANGUAGE**

BISD's Board Policy DEA (Local) establishes a clear, non-discretionary obligation using explicitly mandatory language: "Nonexempt employees who are required to work during an emergency closing for a disaster, as declared by a federal, state, or local official or the Board, **shall be paid** at the rate of one and one-half

8

times their regular rate of pay for all hours worked up to 40 hours per week." ROA.475 (emphasis added).

This mandatory "shall" language distinguishes the policy from discretionary "may" provisions that do not create protected interests. The policy contains no qualifying language suggesting officials retain discretion to deny payment when the stated prerequisites are satisfied. Rather, it establishes a ministerial duty: when the conditions are met, premium pay "shall be paid."

**C.    MURPHY SATISFIED ALL PREREQUISITES UNDER BOARD POLICY DEA (LOCAL)**

The policy establishes three clear prerequisites for premium pay entitlement: (1) nonexempt employee status; (2) being required to work; and (3) during an emergency closing for a disaster. Murphy unquestionably satisfied each element.

### 1.    *Nonexempt Employee Status*

Murphy's employment classification as a nonexempt employee is undisputed. The Job Description for Carpenter in the Maintenance Department explicitly classifies the position as "Nonexempt." ROA.968, ROA.1026.

### 2.    *Required to Work*

The record establishes that Murphy was required, not merely invited, to work during the emergency period. At the March 24, 2020 Board meeting, Superintendent Allen explicitly stated that "the maintenance workers have to work" and "specifically

compared the circumstances to hurricane disaster situations where the District had been closed under emergency declarations." ROA.455-456, ROA.1026. Murphy testified that he understood his supervisor's directive to work was not optional, as would be expected of any diligent employee. ROA.975.

### 3. *Emergency Closing for a Disaster*

The COVID-19 pandemic unquestionably constituted a "disaster" with federal, state, and local declarations. BISD itself acknowledged this in its March 24, 2020 Board Resolution, which expressly referenced that "the President of the United States, and the Governor of Texas both declared the nation and the State of Texas, respectively, to be in a state of disaster due to the potential spread of COVID-19." ROA.870-872.

### D. APPELLEES' "MODIFIED OPERATIONS" DISTINCTION CONSTITUTES IMPERMISSIBLE POST HOC RATIONALIZATION

Appellees' central argument—that BISD engaged in "modified operations" rather than an "emergency closure"—constitutes an after-the-fact attempt to avoid the policy's clear application.

### 1. *The Contemporaneous Record Establishes an Emergency Closure*

The undisputed facts demonstrate that BISD closed its facilities to the public in response to the declared COVID-19 emergency. Murphy testified that "they put signs on all the schools saying that the schools were closed." ROA.968. The

10

District's own communications confirmed that "buildings and offices were closed to the public" with signs specifically indicating closure. ROA.566, ROA.995, ROA.1003.

BISD's March 24, 2020 Resolution—drafted contemporaneously with the events—references both "emergency closure" and "period of modified operations" as alternative circumstances triggering the delegated authority. ROA.870-872. This language suggests the Board understood these could be overlapping rather than mutually exclusive categories.

### 2.    *Post Hoc Interpretations Violate Due Process*

Courts should be particularly skeptical of post hoc interpretations advanced during litigation that contradict previous understanding of policy language. Here, BISD's "modified operations" interpretation emerged only after Murphy and other employees filed grievances seeking premium pay. The Texas Association of School Board's guidance specifically addressed this issue, determining that districts should apply the premium pay policy in effect before the disaster to safeguard public funds and ensure reimbursement eligibility. ROA.485. BISD's after-the-fact reinterpretation directly contravenes this guidance.

### 3.    *The Policy Text Does Not Support the Distinction*

Board Policy DEA (Local) contains no language limiting premium pay to certain types of emergency closures or excluding "modified operations" scenarios.

The policy's plain text establishes entitlement based solely on the three stated prerequisites.

### E.  MURPHY WAS DENIED ADEQUATE PROCEDURAL DUE PROCESS

Having established Murphy's protected property interest, he was entitled to procedural due process before being deprived of that interest. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1985).

#### 1.  *Lack of Pre-Deprivation Notice*

Murphy received no advance notice that he would be denied premium pay despite performing required work during the emergency closure. He was "not informed that [he] would not be paid Premium Pay" until after completing the work. ROA.456. This timing violated the fundamental requirement that employees receive notice before, not after, deprivation of vested benefits.

#### 2.  *Inadequate Post-Deprivation Process*

The grievance process available to Murphy was constitutionally insufficient because the outcome was predetermined by BISD's post hoc policy reinterpretation. The District had already decided to limit premium pay to employees with "consistent, prolonged exposure to the public"—a criterion appearing nowhere in the written policy. ROA.853.

When BISD finally offered a settlement to Murphy and other grievants, the amount ($819.06) represented approximately 19% of the premium pay Murphy had

12

actually earned under the policy ($4,278). ROA.567, ROA.899, ROA.970, ROA.1045. This "take-it-or-leave-it" offer failed to provide meaningful opportunity to contest the deprivation or obtain full relief.

## F.     BISD'S ACTIONS VIOLATED SUBSTANTIVE DUE PROCESS

Beyond the procedural defects, BISD's selective denial of premium pay constituted arbitrary and capricious government action violating substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).

### 1.     *Arbitrary Distinctions Between Similarly Situated Employees*

Premium pay was provided to "child nutrition workers and other nonexempt employees who assisted in distributing food to the public including paraprofessionals, aides, security personnel, and law enforcement personnel." ROA.853, 874-892, ROA.918, ROA.1039.

All of these employees, like Murphy, were: (1) nonexempt; (2) required to work during the emergency; and (3) working during a declared disaster period. The only distinction BISD offered—that some employees had "consistent, prolonged exposure to the public"—appears nowhere in Board Policy DEA (Local) and represents pure administrative invention.

13

### 2.    *Absence of Rational Basis for Differential Treatment*

BISD has offered no legitimate justification for treating maintenance workers differently from other essential employees. All nonexempt employees required to work during the emergency faced potential COVID-19 exposure risks.

### 3.    *Evidence of Improper Motive*

The selective application of the premium pay policy, combined with the temporal proximity to Murphy's protected advocacy, raises an inference that the denial was motivated by animus rather than legitimate policy considerations. This inference is strengthened by the pattern of escalating adverse actions Murphy experienced after raising concerns about the policy's implementation.

## G.    APPELLEES' ARGUMENTS LACK MERIT

Appellees' remaining arguments fail to overcome Murphy's clear entitlement to due process protection.

### 1.    *Deference to Local Interpretation*

Appellees cite *Montgomery Independent School District v. Davis*, 34 S.W.3d 559, 565 (Tex. 2000), for the proposition that school boards are the ultimate interpreters of their policies. This principle does not authorize post hoc reinterpretations that violate due process or contradict the plain language of mandatory policies. Here, the policy's mandatory language left no room for interpretation regarding payment obligations when the prerequisites were satisfied.

14

### 2. *Claimed Absence of Constitutional Violation*

Appellees argue Murphy suffered no constitutional deprivation because he lacked a protected interest. This argument is circular—it assumes the conclusion (no protected interest) to prove the premise (no violation).

## III. MURPHY ESTABLISHED MUNICIPAL LIABILITY UNDER MONELL

The district court committed legal error by concluding that Murphy failed to establish municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

### A. LEGAL STANDARD FOR MUNICIPAL LIABILITY UNDER SECTION 1983

To establish municipal liability under 42 U.S.C. § 1983, a plaintiff must demonstrate three elements: "(1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose 'moving force' is the policy or custom." *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015).

This Court has defined "official policy" to encompass two categories: "(1) A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a

15

custom that fairly represents municipal policy." *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).

State law determines whether a particular individual qualifies as a final policymaker. *McMillian v. Monroe County*, 520 U.S. 781, 786 (1997). Policymaking authority may be expressly or impliedly delegated. *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019).

### B. DR. ALLEN POSSESSED FINAL POLICYMAKING AUTHORITY THROUGH EXPRESS DELEGATION

The district court acknowledged that BISD's Board of Trustees expressly delegated significant policymaking authority to Dr. Allen through the March 24, 2020 Resolution, yet inconsistently concluded she lacked such authority for Murphy's First Amendment claim.

#### 1. *The Board's Express Delegation Created Final Policymaking Authority*

The March 24, 2020 Resolution authorized Dr. Allen: "(1) The authority to act in the place of the Board of Trustees under Board Policy DEA (Local) and thus make all decisions regarding payment of employees during an emergency closure or period of modified operations, to implement the provisions of Board Policy DEA (Local), and to make determinations regarding the purpose of any such expenditures." ROA.853, 871.

16

The district court correctly recognized that this Resolution "does not provide any mechanism by which Allen's decision may be subject to approval or review" and concluded that "BISD's Board delegated to Allen final policymaking authority over the subject matter outlined in the resolution, thereby making Allen a final policymaker for purposes of § 1983." ROA.1164.

Under *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986), a single decision by an official with final policymaking power constitutes an official policy of the municipality. Dr. Allen's decision to deny Murphy premium pay despite the policy's mandatory language was thus an act of official BISD policy, not merely individual misconduct.

### 2. *The District Court's Artificial Limitation Was Legally Erroneous*

The district court erroneously concluded that Dr. Allen's policymaking authority was limited to "management of the COVID-19 crisis" and did not extend to Murphy's First Amendment retaliation claim. ROA.1169-1170. This analysis suffers from two fundamental flaws.

First, Murphy's protected speech directly concerned the premium pay issue—precisely the area where Dr. Allen indisputably possessed final policymaking authority. Murphy alleged he was retaliated against after he "spoke up and petitioned related to Defendants' failure to pay premium pay during school closures consistent with District policy" and "organized to file written grievances with the District."

17

ROA.465. When the same official who controls a policy retaliates against speech about that policy, her retaliatory response cannot be divorced from her policymaking role.

Second, the record demonstrates that Dr. Allen, through the human resources department she supervised, made the ultimate decision to terminate Murphy's employment. ROA.725-726. This decision was not subject to meaningful Board review, demonstrating that Dr. Allen possessed final authority in personnel matters as well.

### 3.    *Appellees' Arguments Lack Merit*

Appellees contend that Dr. Allen's delegated authority "expired in the spring of 2020" when the emergency period ended. This argument misunderstands both the temporal scope of Murphy's claims and the nature of delegated authority. Murphy's retaliation claim encompasses actions occurring after the emergency period that were causally connected to his protected speech during that period. The fact that his grievances and advocacy continued beyond spring 2020 does not sever the causal chain.

Moreover, Dr. Allen's authority as Superintendent to make personnel decisions was not limited to the emergency period. Her role in Murphy's termination—whether direct or supervisory—constituted an exercise of policymaking authority over employment matters.

18

### C.   MURPHY PRESENTED SUFFICIENT EVIDENCE OF AN UNOFFICIAL CUSTOM OF RETALIATION

Alternatively, Murphy established municipal liability through evidence of an unofficial custom "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The district court erroneously dismissed this evidence by viewing it in isolation rather than considering the totality of Murphy's proof.

#### 1.   *Officer Norman's Declaration Provided Direct Evidence of Custom*

Norman stated that "[t]his conduct by the District, based on my years of experience with BISD, is a pattern and practice of retaliatory treatment of employees by the district that speak on matters of public concern." ROA.1073-1074.

#### 2.   *Murphy's Experience Demonstrates the Custom in Operation*

After Murphy began advocating regarding premium pay, he experienced a coordinated series of adverse actions: (1) denial of overtime opportunities previously available to him; (2) a disciplinary write-up for allegedly substandard work; and (3) ultimately, termination based on false threat allegations. ROA.977, ROA.750-751, ROA.725-726.

This escalating pattern of retaliation demonstrates systematic rather than isolated misconduct. The involvement of multiple departments and supervisory

19

levels suggests coordination from higher authority, consistent with an established custom of silencing employee dissent.

### 3. *Evidence of Criminal Accusations as Retaliatory Tool*

Murphy was arrested based on a single uncorroborated statement despite other witness statements that failed to support the allegation. ROA.794, 796-804. Officer Norman corroborated that this represented part of a broader pattern, not an isolated incident. ROA.1073-1074.

The convenience of the threat allegation—arising precisely when Murphy's grievance efforts were gaining additional traction with Union Representative Hector Mireles—supports an inference of systematic misuse of law enforcement to silence employee advocacy. ROA.970.

### D. THE DISTRICT COURT IMPROPERLY DISMISSED CAUSAL CONNECTION

The district court erred in concluding that Murphy failed to demonstrate causal connection between BISD's policies or customs and his constitutional injuries. Municipal liability requires showing that the policy or custom was the "moving force" behind the violation. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "'[A] deliberate choice to follow a course of action- . . . made from among various alternatives . . .'" which results in a constitutional deprivation can be actionable under § 1983. *Id. at* 389, quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484 (1986). Under the deliberate choice standard, where official action "reflects

20

a 'deliberate' or 'conscious' choice" resulting in a constitutional violation can the official be held liable under § 1983. *Id.* That conscious choice amounts to "deliberate indifference" where the possible infringement of a right secured by the Constitution is "'so obvious' that failure to [choose a course of action not violative of the right] could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* at 390 n.10.

### 1.    *Direct Causal Connection for Due Process Claims*

Murphy's due process claims arise directly from Dr. Allen's policy decision to deny premium pay to maintenance workers despite Board Policy DEA (Local)'s mandatory language. The district court acknowledged these as "policies" falling within the first *Monell* classification but erroneously granted summary judgment by conflating the policy identification with the constitutional violation analysis. ROA.1169.

### 2.    *Causal Connection for First Amendment Retaliation*

Murphy filed his "Premium Pay" grievance on July 28, 2020, ROA.566, and subsequently experienced denial of overtime opportunities, disciplinary action, and ultimately termination. This temporal sequence supports the inference that his protected speech was the moving force behind the retaliation.

### E.     APPELLEES' ARGUMENTS FAIL TO NEGATE MUNICIPAL LIABILITY

#### 1.     *Mischaracterization of Murphy's Evidence*

Appellees argue that Murphy failed to identify specific policies or customs, but this assertion ignores the detailed allegations in Murphy's pleadings and summary judgment response. Murphy specifically identified: (1) Board Policy DEA (Local); (2) the March 24, 2020 Resolution; and (3) Dr. Allen's implementing decisions as the relevant policies. ROA.976, 978-981.

#### 2.     *Incorrect Legal Standard for Custom*

Custom may be established through evidence of a pattern of similar acts, and Murphy is not required to produce numerous identical incidents. The combination of Murphy's experience, Norman's testimony, and the systematic nature of the retaliation provides sufficient evidence for a reasonable jury to find custom.

#### 3.     *Failure to Address Official Policy Theory*

Appellees focus primarily on attacking the custom theory while failing to adequately address Murphy's official policy claim. Dr. Allen's decisions regarding premium pay and personnel actions, made with delegated final authority, constitute official BISD policy under *Pembaur*. This theory alone supports municipal liability.

**F.    SECTION    1983    DEMANDS    SPECIFIC    POLICY IDENTIFICATION**

Murphy has satisfied *Section 1983*'s requirement that "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff…." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Murphy identified specific Board policies, resolutions, and implementing decisions that served as the moving force behind his constitutional injuries.

**IV.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON MURPHY'S FIRST AMENDMENT RETALIATION CLAIM**

**A.    LEGAL FRAMEWORK FOR FIRST AMENDMENT RETALIATION CLAIMS**

To establish a First Amendment retaliation claim, a plaintiff must demonstrate: (1) he suffered an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighed the government's interest in promoting efficiency; and (4) his protected speech motivated the adverse employment action. *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999).

**B.    MURPHY'S SPEECH CONSTITUTED PROTECTED EXPRESSION ON MATTERS OF PUBLIC CONCERN**

**1.    THE CONTENT, FORM, AND CONTEXT ANALYSIS SUPPORTS PROTECTION**

23

When determining whether speech involves public concern, courts must examine "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

**Content Analysis:** Murphy's speech addressed multiple issues of inherent public significance: (1) the fair allocation of public funds during a declared emergency; (2) potential racial discrimination in government compensation practices; and (3) historical civil rights matters. ROA.465-466. Murphy's advocacy regarding premium pay extended beyond personal grievances to concerns about public policy and the proper use of taxpayer resources. The record demonstrates that BISD implemented premium pay provisions specifically to seek federal reimbursement for extraordinary labor costs from FEMA. ROA.456. Murphy's objection that "the District had put the policy in place to get the funds, but then they did not pay the workers" directly implicates potential misuse of public resources—an inherently public concern.

**Form and Context Analysis:** Murphy's petition was signed by "a majority of black workers who viewed the treatment as discriminatory toward black auxiliary workers." ROA.465. This directly implicates issues of racial discrimination in compensation practices by a governmental entity—quintessentially a matter of public concern. The Supreme Court has long recognized that speech related to racial discrimination is inherently of public concern. *Connick*, 461 U.S. at 148 n.8.

**2. MURPHY SPOKE AS A CITIZEN, NOT MERELY AS AN EMPLOYEE**

The critical question is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Organizing employees, circulating petitions, and discussing civil rights history were not part of Murphy's ordinary job duties as a carpenter. Therefore, Murphy was speaking as a citizen when engaging in these activities.

While Murphy's advocacy concerned workplace policies, his petition organizing and civil rights discussions fell outside his official carpentry duties and thus qualify for First Amendment protection under *Garcetti v. Ceballos*, 547 U.S. 410, 420-21 (2006).

**C. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON CAUSATION**

**1. TEMPORAL PROXIMITY ESTABLISHES PRIMA FACIE RETALIATION**

The record demonstrates a clear temporal sequence: Murphy's protected activity (filing grievances and circulating petitions about premium pay) was followed by escalating adverse actions including denial of overtime opportunities, disciplinary write-ups, and ultimately termination on false allegations. ROA.465, 746-747. This temporal proximity creates a strong inference of retaliatory motive sufficient to survive summary judgment.

25

## 2.    THE "TRUE THREAT" ALLEGATION PRESENTS DISPUTED FACTS

Murphy consistently denied making any threat and testified that his breakroom conversation concerned his childhood experiences during the Civil Rights era, including the church bombing in Birmingham, Alabama. ROA.465, 919-922. Critically, Officer Norman's excluded affidavit attested that Murphy "was calm and non-threatening" and that "no one made any specific statements to me of a specific threat he had made." ROA.1125.

The existence of conflicting witness accounts creates a genuine dispute of material fact regarding whether Murphy engaged in unprotected threatening conduct or protected speech that was mischaracterized. Multiple individuals present during the alleged incident did not corroborate the threat allegation. ROA.971-972.

## 3.    EVIDENCE OF PRETEXT SUPPORTS RETALIATORY MOTIVE

The record contains substantial evidence suggesting the threat allegation was pretextual:

(a) **Lack of Corroboration:** Only one witness claimed Murphy made a threatening statement, while others present did not support this account. ROA.971-972.

(b) **Investigative Deficiencies:** BISD possessed exculpatory statements that "did not corroborate the facts of the alleged offense" yet proceeded with Murphy's arrest and termination. ROA.971-972.

(c) **Pattern of Escalating Actions:** The threat allegation emerged precisely when Murphy's grievance efforts were gaining renewed traction, following a series of adverse actions that began after his protected advocacy. ROA.970.

### D. APPELLEES' ARGUMENTS FAIL TO NEGATE FIRST AMENDMENT PROTECTION

#### 1. THE MT. HEALTHY BURDEN-SHIFTING ANALYSIS

While appellees offer non-retaliatory explanations, Murphy is entitled to have a jury evaluate those explanations against evidence of pretext and temporal proximity. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)

#### 2. THE PICKERING BALANCE FAVORS MURPHY

Assuming arguendo that Murphy's advocacy caused workplace disruption, his interest in exposing potential misuse of public funds and discriminatory practices during a public emergency outweighs any governmental interest in avoiding workplace discord. The alleged "disruption" was largely manufactured by BISD's overreaction to legitimate public concerns.

### V. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON MURPHY'S FOURTH AMENDMENT MALICIOUS PROSECUTION CLAIM

#### A. LEGAL FRAMEWORK FOR FOURTH AMENDMENT MALICIOUS PROSECUTION CLAIMS

27

The Supreme Court's decision in *Thompson v. Clark* established that plaintiffs may pursue Fourth Amendment malicious prosecution claims under 42 U.S.C. § 1983. *Thompson v. Clark*, 596 U.S. 36, 42 (2022). To prevail on such a claim, a plaintiff must demonstrate: "(1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; and (6) damages." *Armstrong v. Ashley*, 60 F.4th 262, 280 (5th Cir. 2023).

Critically, *Thompson v. Clark* eliminated the requirement that plaintiffs demonstrate affirmative evidence of innocence. *Thompson v. Clark* , 596 U.S. at 44. A plaintiff need only show that the prosecution ended "without conviction" to satisfy the favorable termination element. *Id.*

### B.    APPELLEES MISCHARACTERIZE THE PROCEDURAL POSTURE

Murphy's Third Amended Complaint explicitly pleads a Fourth Amendment malicious prosecution claim, alleging that "BISD and Allen put Murphy between the rock and the whirlpool and Murphy chose to defend himself rather than plea. By the time Murphy was called to trial, the prosecution had no supporting witnesses and no case and was forced to face the fact that BISD had falsely accused Murphy and insisted upon his arrest to silence him and give a false basis to terminate him." ROA.967.

C.     **Genuine Issues of Material Fact Preclude Summary Judgment on Probable Cause**

1.     <u>**THE EVIDENTIARY RECORD RAISES SUBSTANTIAL QUESTIONS ABOUT PROBABLE CAUSE**</u>

The evidence most favorable to Murphy demonstrates that only one employee provided a statement directly supporting the threat allegation. ROA.747, 794. Significantly, other individuals present during the alleged incident did not corroborate this account. As Murphy testified and as reflected in the record, several witnesses were present but "did not corroborate the facts of the alleged offense." ROA.971-972. Norman attested that Murphy "was calm and non-threatening" and that "at no point did he make any threats in my presence, nor did anyone make any specific statements to me of a specific threat he had made", undermining the probable cause determination. ROA.1125.

2.     <u>**MURPHY'S ALTERNATIVE EXPLANATION CREATES FACTUAL DISPUTES**</u>

Murphy consistently maintained that his breakroom conversation concerned his childhood experiences in Alabama during the Civil Rights era, including references to historical events such as church bombings. ROA.1055, 1062-1070. Murphy testified that "because it was Black History Month, [he] just wanted to say what happened to [him] as a child." ROA.1065, 1067-1069.

### 3. THE CHIAVERINI STANDARD SUPPORTS MURPHY'S CLAIM

The Supreme Court's recent decision in *Chiaverini v. City of Napoleon* clarifies that the presence of probable cause for one charge in a criminal proceeding does not categorically defeat a Fourth Amendment malicious-prosecution claim relating to another, baseless charge. *Chiaverini v. City of Napoleon,* 602 U.S. 556, 556 (2024).

Under Texas Penal Code § 22.07, a terroristic threat requires intent to cause specific reactions or place persons in fear. The complaining witness (Devault) was not even present to hear the alleged conversation or to perceive a threat. The disputed and uncorroborated nature of the single witness account, combined with Murphy's alternative explanation and the lack of any corroborating physical evidence or threatening behavior, raises substantial questions about whether this standard was met.

### D. EVIDENCE OF MALICE AND RETALIATORY INTENT

### 1. TEMPORAL PROXIMITY AND PATTERN OF RETALIATION

Murphy filed his "Premium Pay" grievance in July 2020, and subsequently faced denial of overtime opportunities, a questionable disciplinary write-up, and ultimately the threat allegation in February 2022. This temporal sequence supports an inference of retaliatory motive.

30

Officer Norman's declaration provides direct evidence of malicious intent, stating that "in hindsight given the facts recited to me at the scene of the arrest by Mr. Murphy, it is clear to me the district retaliated against Mr. Murphy in violation of his First Amendment Rights." ROA.1125. Norman further attested that he himself became "the victim of 1st Amendment Retaliation by the District" following Murphy's arrest, suggesting that the District's retaliatory conduct extended to those who failed to fully support the official narrative. ROA.1125.

### 2. BISD'S ACTIVE ROLE IN THE CRIMINAL PROCESS

The record demonstrates that BISD administrators actively participated in initiating the criminal process. Mr. Devault received the complaint, secured written statements, and contacted the police department. ROA.747. The District's Human Resources Department was immediately involved, and Murphy was placed on administrative leave pending the investigation. ROA.809, 835-838.

Most significantly, Murphy alleges that BISD "insisted upon his arrest to silence him and give a false basis to terminate him." ROA.967.

### E. MUNICIPAL LIABILITY UNDER MONELL

As discussed extensively in Section II of this brief, Dr. Allen possessed final policymaking authority in multiple relevant areas, including employee discipline and the coordination of District responses to alleged threats. Her involvement in Murphy's case—from the premium pay decision through the investigation and

31

termination—establishes the necessary connection between municipal policy and constitutional violation.

Furthermore, Officer Norman's declaration described a "pattern and practice of retaliatory treatment of employees by the district that speak on matters of public concern." ROA.1126. Norman's testimony, based on his "years of experience with BISD," constitutes competent evidence of a widespread custom that supports municipal liability.

### F. THE DISTRICT COURT'S EXCLUSION OF OFFICER NORMAN'S DECLARATION WAS PREJUDICIAL ERROR

The district court's exclusion of paragraphs 5 and 6 of Officer Norman's declaration was particularly damaging to Murphy's Fourth Amendment claim. Norman's firsthand observations as the arresting officer—that Murphy appeared calm and non-threatening, and that no specific threat was relayed to him—directly undermine the probable cause determination. His testimony about the District's retaliatory pattern provides crucial context for understanding the malicious prosecution claim. The improperly excluded evidence would have created genuine issues of material fact on both the probable cause and malice elements of Murphy's claim.

### VI. ISSUE FIVE: DR. ALLEN IS NOT ENTITLED TO QUALIFIED IMMUNITY

### A. STANDARD OF REVIEW FOR QUALIFIED IMMUNITY

This Court reviews a district court's grant of summary judgment based on qualified immunity de novo. *Rockwell v. Brown*, 664 F.3d 985, 990 (5th Cir. 2011). Qualified immunity shields government officials from civil liability insofar "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015); *White v. Pauly*, 580 U.S. 73, 79 (2017).

The qualified immunity analysis requires two inquiries: (1) whether the plaintiff has alleged a violation of a clearly established constitutional right, and (2) whether the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident. *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 325 (5th Cir. 1998). When a defendant asserts qualified immunity in a motion for summary judgment, the plaintiff must show that there is a genuine dispute of material fact and that the plaintiff's version of those disputed facts constitute a violation of clearly established constitutional law. *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020).

### B. MURPHY ESTABLISHED VIOLATIONS OF CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS

#### 1. DR. ALLEN'S PERSONAL INVOLVEMENT IN CONSTITUTIONAL VIOLATIONS

Appellees contend that Murphy "unequivocally" failed to connect Dr. Allen to the First and Fourth Amendment violations. ROA.1183. This assertion contradicts

the record evidence, which demonstrates Dr. Allen's direct involvement in each constitutional deprivation.

**Premium Pay Decision and Due Process Violation**: Dr. Allen, as Superintendent with Board-delegated authority, was the final decision-maker regarding premium pay implementation during the COVID-19 emergency. ROA.853, 870-872. The March 24, 2020 Board Resolution specifically authorized Dr. Allen to "act in the place of the Board of Trustees under Board Policy DEA (Local) and thus make all decisions regarding payment of employees during an emergency closure." ROA.871. Dr. Allen's subsequent decision to deny premium pay to Murphy while providing it to similarly situated employees was an exercise of her delegated policymaking authority. ROA.853, 857-858.

**First Amendment Retaliation**: Dr. Allen's role as Superintendent made her responsible for personnel decisions affecting Murphy. The temporal sequence of adverse actions against Murphy—denial of overtime opportunities, disciplinary write-ups, and ultimately termination—occurred under Dr. Allen's administration and required her knowledge and approval. ROA.746-747, 725-726. The termination decision, in particular, would require the Superintendent's authorization given its severity and the underlying criminal allegations.

**Fourth Amendment Malicious Prosecution**: Murphy's allegation that Dr. Allen and BISD "insisted on Murphy's arrest to silence him and give a false basis to

34

terminate him" directly implicates Dr. Allen in the initiation of criminal proceedings. ROA.967. As the chief executive officer of BISD, Dr. Allen was responsible for the District's response to the alleged threat and the decision to involve law enforcement.

## 2. CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS

The constitutional rights at issue were not merely clearly established—they represent foundational principles of constitutional law that any reasonable public official would understand.

**Due Process Rights**: The Supreme Court established in *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972), and *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), that public employees cannot be deprived of protected property interests without adequate procedural safeguards. Murphy's property interest in premium pay arose from BISD's mandatory policy language stating that nonexempt employees "shall be paid" premium rates during emergency closures. ROA.475. Any reasonable superintendent would understand that arbitrarily denying earned compensation guaranteed by written policy violates due process.

**First Amendment Retaliation**: The prohibition against retaliating against public employees for protected speech has been clearly established since *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). The Supreme Court's decision in *Lane v. Franks*, 573 U.S. 228, 241 (2014), further clarified that public employees retain First Amendment protection when speaking as citizens on matters of public concern. Murphy's

35

advocacy regarding premium pay policies and potential discriminatory treatment constituted protected speech on matters of public concern. Any reasonable school administrator would know that retaliating against an employee for filing grievances about district policies violates the First Amendment.

**Fourth Amendment Protection**: The right to be free from arrest without probable cause is fundamental and clearly established. *Illinois v. Gates*, 462 U.S. 213 (1983). Moreover, the Supreme Court's decision in *Thompson v. Clark*, 596 U.S. 36 (2022), clarified that malicious prosecution claims are cognizable under the Fourth Amendment when criminal proceedings are initiated without probable cause and with malicious intent.

## C. DR. ALLEN'S CONDUCT WAS OBJECTIVELY UNREASONABLE

### 1. ARBITRARY IMPLEMENTATION OF PREMIUM PAY POLICY

Dr. Allen's interpretation and application of Board Policy DEA (Local) was objectively unreasonable. The policy's plain language required premium pay for "nonexempt employees who are required to work during an emergency closing for a disaster." ROA.475. Murphy satisfied both prerequisites: he was a nonexempt carpenter required to work during the COVID-19 emergency closure. ROA.968, 455-456.

36

Dr. Allen's post hoc limitation of premium pay to employees with "consistent, prolonged exposure to the public" appears nowhere in the policy text and contradicts the Board's delegation of authority to "implement the provisions of Board Policy DEA (Local)." ROA.743, 853. A reasonable superintendent would not have believed she could rewrite policy terms to exclude eligible employees without Board approval.

## 2.    RETALIATORY PATTERN OF ADVERSE ACTIONS

The sequence of adverse actions against Murphy following his protected speech creates an objectively unreasonable pattern of retaliation. After Murphy filed grievances regarding premium pay:

1. He was denied overtime opportunities previously available to him. ROA.977.

2. He received his first disciplinary write-up for allegedly substandard work. ROA.750-751.

3. He was arrested based on a single uncorroborated witness statement. ROA.794.

4. He was terminated for both the alleged threat and failure to cooperate with the investigation. ROA.725-726.

This escalating pattern of retaliation, occurring in close temporal proximity to Murphy's protected speech, would alert any reasonable official to the constitutional impropriety of the actions.

### 3. LACK OF ADEQUATE INVESTIGATION

Dr. Allen's administration proceeded with Murphy's arrest and termination despite possessing witness statements that failed to corroborate the threat allegation. ROA.971-972. Officer Norman's contemporaneous observations that Murphy was "calm and non-threatening" and that "no one made any specific statements to me of a specific threat he had made" should have given any reasonable official pause before proceeding with criminal charges. ROA.1125.

### D. FACTUAL DISPUTES PRECLUDE QUALIFIED IMMUNITY AT SUMMARY JUDGMENT

Material factual disputes exist regarding both the nature of Murphy's conduct and Dr. Allen's involvement in the alleged constitutional violations.

**Dispute Regarding Threat Allegation**: Murphy maintains he never made any threatening statement and that his breakroom conversation concerned historical civil rights events. ROA.1055, 1062-1070. This directly contradicts the allegation that formed the basis for his arrest and termination. If Murphy's version is credited, then Dr. Allen's actions were based on false pretenses.

38

**Dispute Regarding Dr. Allen's Knowledge and Intent**: Murphy alleges that Dr. Allen was aware of his protected speech and that the subsequent adverse actions were retaliatory. ROA.969, 1000-1003. Officer Norman's declaration supports this allegation, stating that "it is clear to me the district retaliated against Mr. Murphy in violation of his First Amendment Rights." ROA.1125.

### E.     THE "OBVIOUS WRONGNESS" STANDARD APPLIES

Even absent precedent in materially similar circumstances, qualified immunity is defeated when the constitutional violation is so obvious that any reasonable official would understand that the conduct violates the law. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Dr. Allen's alleged conduct—arbitrarily denying earned compensation, retaliating against protected speech, and facilitating a baseless arrest—represents such obvious constitutional violations that no reasonable school superintendent could believe such actions were lawful. The combination of these violations over an extended period demonstrates a pattern of conduct that "so obviously runs afoul of the law" that qualified immunity cannot apply. *Id.*

### CONCLUSION

The court abused its discretion by excluding Officer Norman's declaration, which contained specific factual observations based on personal knowledge that would have created genuine issues of material fact on Murphy's constitutional

39

claims. The court further erred by concluding Murphy lacked a protected property interest in premium pay under Board Policy DEA (Local), whose mandatory language created a clear entitlement that BISD violated through arbitrary implementation and post hoc rationalization.

The district court's grant of summary judgment on Murphy's *Monell* claims ignored substantial evidence establishing municipal liability through Dr. Allen's delegated final policymaking authority and BISD's unofficial custom of retaliatory conduct. Similarly, the court improperly resolved factual disputes regarding Murphy's First Amendment retaliation and Fourth Amendment malicious prosecution claims, where genuine issues of material fact preclude summary judgment. Finally, Dr. Allen is not entitled to qualified immunity because Murphy established violations of clearly established constitutional rights and demonstrated that Dr. Allen's conduct was objectively unreasonable.

When the evidence is viewed in the light most favorable to Murphy, as required at summary judgment, he has presented sufficient proof to survive summary judgment on all claims.

WHEREFORE, Appellant Greg Murphy respectfully requests that this Court: (1) reverse the district court's order granting summary judgment in favor of Defendants on all claims; (2) reverse the district court's order excluding Officer Norman's declaration; (3) reverse the district court's grant of qualified immunity to

Dr. Allen; and (4) remand this matter to the district court for further proceedings consistent with this Court's opinion, including trial on the merits of Murphy's constitutional claims.

SUBMITTED BY:
/s/ *Brandon P. Monk*
Brandon P. Monk
THE MONK LAW FIRM
4875 Parker Drive
Beaumont, TX 77705

## CERTIFICATE OF SERVICE

I certify that on May 28, 2025, the foregoing document was forwarded via the electronic filing system on today's date to the following parties/counsel:

SPALDING NICHOLS LAMP LANGLOIS
Paul A. Lamp
State Bar No. 24002443
Federal I.D. 21711
Email: plamp@snll-law.com
3700 Buffalo Speedway, Suite 500
Houston, Texas 77098
Telephone: (713) 993-7066
Facsimile: (888) 726-8374

SPALDING NICHOLS LAMP LANGLOIS
Melissa M. Goins
State Bar No. 24074671
Federal I.D. 2089537
Email: mgoins@snll-law.com
3700 Buffalo Speedway, Suite 500
Houston, Texas 77098
Telephone: (713) 993-7057
Facsimile: (888) 726-8374

*Attorneys for Defendants-Appellees*
*Beaumont Independent School District and Shannon Allen*

/s/ *Brandon P. Monk*
Brandon P. Monk

41

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), and 5th CIR. R32.1: this document contains 6962 words.

2.      This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/ *Brandon P. Monk*
Brandon P. Monk